Our last case this morning is Bruce Fleming v. Department of the Navy, 2024-1557. Mr. Ehrenberg, when you're ready. Thank you, Your Honor, and good morning to all. May it please the Court, Jason Ehrenberg, on behalf of Professor Bruce Fleming. I'm reserving five minutes of my time because I think we've said everything that needs saying in the brief or that can be said in the brief. I think what I would say to the Court is that one has to look at the bias and one has to look at the context. The bias of the decision-maker and the context of the action or the utterance. This is a case where essentially an English professor who writes about, if you look at Appendix 726, writes articles on the vocabulary of transgender theory and talks about implications of separating sex from gender and whether men should be talking about these issues or women, getting into basically the nature of what it is to be transgender. This isn't a question of writing an article. It's not a question of free speech. It's a question of what he did during class. I'm sorry, Your Honor. Performance. And essentially he's being terminated for talking about transgender issues. He's taking off his shirt and he's sending photos around. Doesn't the academy have a right to determine what kind of performance occurs in its classes? They certainly do, but this is not a case where somebody was taking off his shirt in class and doing this. It was the essence of the... It's an English class. It's an English class where the professor writes... He's taking off his shirt and sending around pictures of himself without a shirt, right? That's not what the record reflected. I know English literature is expressive, but this kind of redefines expression. I think that taking off a shirt is a red herring. That is not something that is occurring in the classroom. Combine that with all of the other herrings in the case. I'm sorry? Combine that with the general condom that underlies the charges that were brought against the professor. I mean, that whole broad category of condoms. Yes, sir. There were seven specifications. And I think I am not reading between the lines when I say that the individual who looked and decided whether this behavior was appropriate or professional or whatever the vague, vacuous notion or standard is of what a federal employee, what conduct is unbecoming, I think penalizing somebody for talking about things that they wrote about and that they assigned readings about, though maybe uncomfortable for some, that's not the point of the Naval Academy. It's the number four ranked liberal arts school in the U.S. News. It's not just a military institution. It's a college. And yes, there are certain things about this college that are unique, but the right of a professor to talk about- Why don't you discuss the standards that were used to judge your client's conduct. What standards were applied? I think the standard is, at least according to the administrative judge below, the proper standard is to look at the conduct in the context of the situation in which it occurred. So if you're talking about somebody being unhappy with a picture being sent to them of my client, this is- the appendix is full of pictures of my client and his students like this, arms around each other, wearing costumes, smiling, flexing because it's the Naval Academy and your physical abilities and your physical strength is more relevant than it is in another college. But I think you have to look at the context in which the specific things arose and what the specific allegations are. And they're essentially trying to make it seem as though my professor, my client, was sexually harassing his students. They basically walk all the way up there and don't say those words. But it's clear to me as a reader that the board did not take into account the context. The board, like Dean Phillips, Provost Phillips, the agency decider here, Dean Phillips had previously punished Professor Fleming in 2011. He punished him and denied him a merit pay raise. Professor Fleming went to the Office of Special Counsel and the Office of Special Counsel, and this is at appendix 1057, the Office of Special Counsel determined that the decision violated appellant's rights. And specifically, it was his free speech rights. And I'm not saying here that my client was fired for First Amendment rights, but what I'm saying is as a professor at a college where he's teaching a class where one of the subjects is transgender surgery and the language surrounding gender and homosexuality, it's perfectly proper. Not even, it's professional. It's, what is the line there? You know, he writes about the stuff. He talks about it. He teaches about it. See, that's what I was asking you. What is the line? What's the standard that was used? Where did they come from? Is there a policy? I don't think there is a standard. I think today there may be a very different standard than there was five or six years ago as to what employees can say and reasonably be, federal employees can say and reasonably expect to be protected. When it comes to codes of conduct, they're generally drafted quite broadly. And so now there's an element of common sense as to when are you crossing the line. And here there's a record of findings, finding that your client was continually crossing the line in very different ways. Yes, the subject of sex can come up in a classroom, but it depends on how it comes up and whether it's off topic or on topic. I mean, just because he may have written an article about transgender surgery or something else, then it comes down to how does it actually come up and how does the subject of sex come up and how does the subject of all these other things that came up. And there's a little bit of common sense, maybe a lot of common sense involved here when we're trying to make an assessment of what's acceptable and what's really not acceptable conduct and conduct unbecoming. I would argue that the analysis should not be what's acceptable or not acceptable when we're talking about language and speech in a college classroom. I understand there... We're still in a senior subordinate situation in the Naval Academy and the federal employee. And so there are certain expectations and standards that people ought to be held to. And it's not so free form that it's anything goes. And I'm not suggesting that anything goes or that anything my client did allegedly... The real problem we have here is that this has already been litigated below and the fact finding has been done and the record is fixed. And now when we're at this stage, we're in appellate court where we give a lot of deference to administrative tribunals like the MSPB. So we can't just revisit everything and undertake a re-litigation of the case. No, and I don't believe our appeal is asking that everything be revisited. I think at the core, the appeal is not suggesting but articulating that if you look at these things in the context, as I'm saying, they arose. And you don't just isolate things. This is an English class. And he emailed partially closed photos. He mispronounced an Asian American's name multiple times. He made demeaning remarks about a child and her mother. All of that would seem to be irrelevant to teaching, what, English? Not English language but English literature? Following your point, sir, the argument would then turn to what's the appropriate remedy? What's the appropriate punishment or appropriate penalty for a 31-year English professor who has, I won't get into all the laudatory things I can say about his career, but what happened was within a matter of a few months after he wrote an article that appeared in the Federalist, Dean Phillips started an investigation into him. All of the midshipmen in any class he ever took were given a survey and asked, did any of these things ever happen? Or did Professor Fleming ever do this? It didn't say what was the context in which it happened. The board, in its decision, did not note what specific language was inappropriate or even what words were uttered about transgender or homosexuality or anything. If you're into your rebuttal time, you can continue or save it. I will stop there, sir. All right. Ms. Shimada. Good morning, Your Honors. May it please the Court. I would like at the outset to start by addressing the allegations of bias and retaliation, which my friend here referred to as penalizing Dr. Fleming for writing articles. Dr. Fleming raised those issues as affirmative defenses before the MSPB, before the administrative judge, and the administrative judge specifically addressed and rejected them. Dr. Fleming chose not to appeal that decision before the full board, and the full board also affirmed. Likewise, he failed to challenge that decision before this Court. Therefore, the Court should not even consider those allegations of bias and retaliation because that issue has been resolved. Regarding the other matters, the standard here is whether Dr. Fleming engaged in conduct unbecoming a federal employee. That charge has no specific elements. The agency was required to prove that he engaged in the underlying conduct supporting the charge and that the conduct was improper in the U.S. Naval Academy setting. Substantial evidence here supports the board's conclusions with regard to both points. Specifically, as we explained in our briefs... I guess the challenge here is that conduct unbecoming is very broad and not very specific and can be a bit impressionistic. When we look at the two decisions that are before us, the AJ had one view of things and then the board had another view of things. Is this a case where things are a little murky as to whether someone crossed the line, so to speak, in terms of what makes good sense or doesn't make good sense? Or in terms of what is, I don't know, bantering that doesn't quite rise to the level of something actionable versus something that, like I said, crosses the line? Yes, Your Honor. We would argue that the administrative judge's decision is not supported by substantial evidence and the full board's is. The administrative judge did not consider the totality of the record as is required under the standard of review. Instead, the administrative judge started by essentially attacking the credibility of the main complainant, M.D., on issues based on M.D.'s religious upbringing, which, as we explained in our brief, is not permissible under the federal rules of evidence and suggests bias by the administrative judge. Additionally, the board considered, additionally, the administrative judge found M.D. not credible when his statements were unsupported or not corroborated by other evidence. However, as we explained in our brief as well, every single point on which M.D. testified was corroborated by either documentary evidence and or other witnesses. The board, unlike the administrative judge, considered the totality of the evidence. Is the board entitled to overrule credibility determinations by the administrative law judge? I'm so sorry, Your Honor. Can you repeat the question? Is the board entitled to overrule credibility determinations that's made by the administrative law judge? Yes, Your Honor. The board is entitled to do so, provided that it provides sound reasons for doing so. Here, what were the sound reasons? The sound reasons, so there were two credibility determinations made by the administrative judge. One was concerning R.J., which was the Asian American student who complained and testified regarding Dr. Fleming mispronouncing his name. And then the second was concerning M.D. With regard to M.D., the credibility determination was irrelevant because there were no contradictory statements on the record on which to make a credibility determination. As I stated, everything that M.D. testified regarding was corroborated. The administrative judge relied on M.D.'s religious upbringing to claim that, well, essentially most of the other students were unoffended, but because M.D. came from a religious background, he took particular offense, and therefore he should not deserve any credit for his testimony. The board explained on appendix page 11 that regardless of whether anyone was actually offended, the conduct still amounted to conduct unbecoming. And then with regard to the credibility determination for R.J., the board provided three main reasons for rejecting that determination. First, the board referenced specific portions of the record which established that the administrative judge's finding regarding the discrepancies and lack of corroboration with R.J.'s testimony were factually inaccurate. For example, the A.J. questioned R.J.'s credibility because when he was interviewed by the panel, he said he wasn't sure if the mispronunciation was done on purpose. However, the board explained, even though R.J. said he was unsure if it was done on purpose, he felt that it was intentionally directed at him. So there was no real discrepancy there. As to the corroboration, several other students also remarked on Dr. Fleming's pronouncing students' names, particularly Asian names. And second, unlike the administrative judge, the board engaged in a fulsome analysis of the record to assess the credibility of R.J. and Dr. Fleming. For instance, the administrative judge faulted R.J. for not specifically mentioning the F-off comment to the panel, but R.J. stated that profanity was directed at him two or three times. The A.J. did not, but the board did acknowledge Dr. Fleming's own lack of forthrightness on this point. He never denied that he said F-off to R.J., but instead denied saying F-you, which are different things. And finally, the board articulated that Dr. Fleming's own lack of forthrightness and contradictions detracted from the weight of the evidence of his version of events. For instance, in his deposition, he thrives to claim that he could not recollect whether he mispronounced R.J.'s name, and only denied doing so after he was specifically asked if he denied it. He also never denied saying F-off. So those are the some reasons that the board provided for rejecting the credibility determinations of the administrative judge. As to context, the proper context in which to evaluate Dr. Fleming's conduct is the U.S. Naval Academy, which is unlike a regular civilian institution. As we explained in our brief, this court has explained that conduct that might be overlooked in some settings can be inappropriate, or if it's contrary to the mission of the agency. Here, the record is clear that the Naval Academy's mission is to train officers of what's acceptable and unacceptable conduct, so that when those officers are in charge of a fleet and supervising a subordinate, they understand how to treat them. In support of that mission, all faculty members are expected to exemplify dignity and respect, and several witnesses, including Captain Chadwick, Dean Phillips, and Professor Lidler, testified that Dr. Fleming's conduct was inappropriate and contrary to the agency's mission. Also, I want to briefly address the claim that my friend made that the subject of the class was transgender surgery. But other than counsel's statements here and before the AJ, and before the administrative judge, there's actually no evidence on the record to show that the sexual topics and the discussion of transgender surgery was connected to the course material at all. Several students either stated to the panel in their complaints or testified before the administrative judge that those discussions were immaterial to the class. Unless the court has any other questions. Thank you, counsel. We respectfully request that the court affirm the decision of the court. Thank you. Mr. Ehrenberg has some rebuttal time. Yes, sir. Thank you. I will just touch on one or two issues. First, counsel for the government referred to the Naval Academy as somewhere where they're training officers to lead. The ROTC, which is at many other universities, graduates officers to lead. Those are college institutions. Those officers are no different than the officers that graduate from the Naval Academy. With regard to credibility, MD's testimony was not corroborated. It was greatly exaggerated, is what the administrative judge found. While underlying things may have happened the way they happened or the extent to which things happened, it was greatly exaggerated. The agency feels the need to dig into the record and point to hearsay evidence, which is not properly before this body, my client's deposition. There was an administrative hearing, essentially a trial, and that's where the testimony would have to come from, not from a deposition. I think at core, and I appreciate the court's hesitancy to look at the context I want this to be looked at in, but I think the context is not just an English classroom. The context is also Dean Phillips not knowing what my client teaches, admitting that at the hearing, saying he was unaware that my client taught these areas and wrote about these subjects. Necessarily, they're wrong. They're excluded. You can't talk about them in the classroom. And I think the question does become, what is the proper cutoff? There is no bright line, black line rule. It's reasonableness. And I think the only decider here who looked at this without bias and with reason was the administrative judge. I think the board showed significant bias in its treatment of some of the issues. And I will stop there and thank the court for its time. We appreciate your comments and arguments. The case is submitted.